[Civil No. 3171.   Filed November 16, 1932.]

[15 Pac. (2d) 969.]

S. LEEKER, Appellant, v. HARRY MARCOTTE and RUTH MARCOTTE, Husband and Wife, and A. L. PECK and CARMEN PECK, Husband and Wife, Appellees.

Mr. Duane Bird, and Mr. Samuel L. Pattee, for Appellant.

Messrs. Duffy & Robins, Mr. Charles L. Hardy and Mr. Leslie C. Hardy, for Appellees.

LOCKWOOD, J.—This is an action by Harry Marcotte and Ruth Marcotte, husband and wife, and A. L. Peck and Carmen Peck, husband and wife, hereinafter called plaintiffs, against S. Leeker, hereinafter called defendant, asking for a declaratory judgment as to the validity and construction of certain written instruments, and the legal relations arising therefrom between the parties to this action. The case was tried to the court sitting without a jury, and judgment was rendered declaring the instruments in question to be null and void and of no legal effect between the parties, and from such judgment this appeal is taken.

The facts of the case have in effect been agreed upon by the parties to be as follows: On January 1st, 1919, defendant and his wife, Rae Leeker, were the owners, as community property, of lot 13 in block 17 of the town of Nogales, with the building thereon. On that date defendant executed a lease of the upper floor of such building in favor of one Ben Evans, hereinafter called the lessee, to be used as a hotel. Defendant himself was in possession of the lower floor and using it in the mercantile business. Some months thereafter Evans came to defendant with a proposition that the latter lease to him part of the lower floor then occupied by defendant as aforesaid, as well as the upper floor, and that the premises be remodeled. After some discussion it was agreed between the parties that defendant would advance to Evans the money necessary for such remodeling, and when the work was finished give him a new lease covering both the upper floor of the building and a certain part of the lower floor. Evans was to repay the cost of remodeling, giving defendant a note payable in monthly installments and a bond signed by Peck and another guaranteeing the note; to carry tenants' insurance on the improvements, and to insert in the lease to be made a provision that if any default were made in the repayment of the amount advanced, the lease could be canceled by defendant. The improvements were made in accordance with this understanding, and when they were finished it appeared that their cost amounted to a little over $24,000. Evans paid defendant the excess over $24,000 in cash, and on July 14th the two executed a certain written lease. This lease, so far as it is material in this case, reads as follows:

" . . . That the said party of the first part does by these presents lease and demise unto the said party of the second part,

"Those certain premises known as Hotel Evans, (Heretofore known as the National Hotel), consisting of the upper or second floor of that certain building located on Lot Thirteen (13) in Block Seventeen (17) of the Town of Nogales, Arizona, together with the lobby on the lower floor of said building, with sample rooms and heating plant in rear, together with all furniture and fittings, in said premises, for use as a hotel and purposes incidental thereto only, with the appurtenances, for the term of fifteen (15) years from the 15th day of July, 1919, at the monthly rent or sum of Four Hundred Fifty Dollars ($450.00) payable in Gold Coin of the United States of America, in advance, on the 1st day of each and every month during the said term, during the first seven (7) years of said term, and Six Hundred Dollars ($600.00) monthly in advance on the first day of each and every month thereafter during the remaining eight years of said term; and this lease is made in further consideration of the agreement of the party of the second part, which is hereby made by these presents, to repay to the party of the first part all sums heretofore advanced by him for the purpose of remodeling the said premises, the said sums amounting to the sum of Twenty Four Thousand ($24,000.00) Dollars, payment to be made in accordance with the provisions of that certain promissory note, under date of July 15, 1919, which is in the following words and figures:

"Installment Note

"$24,000.00          Nogales, Arizona, July 15, 1919.

"As hereinafter agreed, after date, for value received, I promise to pay to the order of S. Leeker, the sum of Twenty Four Thousand Dollars, ($24,000.00) in United States gold coin, at the Nogales National Bank, Nogales, Arizona, with interest at the rate of six per cent. (6%) per annum from date until paid. And it is hereby agreed that the said amount of Twenty Four Thousand Dollars shall be paid in installments of not less than One Hundred and Fifty Dollars ($150.00) per month, together with interest upon the balance remaining unpaid, beginning August 15th, 1919, and on or before the 15th day of every month thereafter until the whole amount

of the principal and interest is paid; and should default be made in the payment of any installment at the time when the same is above promised to be paid, then the whole unpaid amount shall become immediately due and payable; and in the event default is made in any of the above payments, and said note is placed in the hands of an attorney for collection, or suit is brought on the same, then an additional amount of ten per cent (10%) of the amount found due shall be added to the same as collection fees.

"BEN EVANS.

"And it is further agreed that if any rent shall be due and unpaid or if default shall be made in any of the covenants herein contained, or in any payment due under said note, that it shall be lawful for the said party of the first part to re-enter the said premises and remove all persons therefrom. . . . "

And the note set forth in the lease was duly executed by Evans and delivered to defendant. This lease superseded the lease of January 1st, and Evans went into possession of the premises thereunder. On August 7th, 1919, Evans, as principal, and A. L. Peck and H. Dolson, as sureties, executed a bond to defendant in the sum of $24,000 conditioned for the payment of the note aforesaid. The payments set forth in the lease, both rental and on the note, were duly and promptly made by Evans in accordance with the terms thereof, until October 22, 1921, when a further agreement was entered into between Evans, the Marcottes, and Leeker. By the terms of this agreement Evans sold to the Marcottes the hotel business in question and "all the right, title and interest of the said party of the first part in and to that certain lease of those certain premises known as the Hotel Evans, and consisting of the upper or second floor of that certain building located on Lot Thirteen (13) in Block Seventeen (17) in the City of Nogales, Santa Cruz County, Arizona, together with the lobby on the lower floor of the said building, and

at 131 Morley Avenue, Nogales, Santa Cruz County, Arizona, together with sample rooms and heating plant in the rear of said lower floor of said building and all furniture and fittings in said premises belonging to the said party of the third part, which said lease was made and entered into on the 15th day of July, 1919, between the said party of the third part and the said party of the first part, which said lease is recorded in the office of the County Recorder of Santa Cruz County, Arizona, in Book Two of Leases at page sixteen, reference hereby being made to the said lease for all things contained therein and the same being made a part hereof as fully as though set out herein. . . . ''

The Marcottes further obligated themselves as follows:

'' . . . The said parties of the second part agree and obligate themselves to pay monthly to the said party of the third part, beginning the 15th day of the month, a sum of money equal to the installment on the principal and the accrued interest due and owing by the said party of the first part to the said party of the third part upon that certain promissory note executed by the said party of the first part in favor of the party of the third part under date of July 15, 1919, for the principal sum of Twenty-four Thousand ($24,000.00) Dollars, with interest thereon at the rate of six (6%) per cent per annum from date until paid, such interest being payable monthly and the principal of said note being payable in monthly installments of One Hundred Fifty ($150.00) Dollars per month, the balance now due and owing on the said promissory note being Twenty Thousand and Nine Hundred Fifty ($20,950.00) Dollars, and it being understood that the said parties of the second part will make such payments to the said party of the third part on the 15th day of each and every month, beginning the 15th, following the time of the taking possession by them of the said Hotel Evans and continuing on the 15th day of each and every month

thereafter until the entire amount of both principal and interest of said note shall have been paid."

The Marcottes went into possession of the premises and continued to conduct the hotel business, paying the rent and installments due on the note in accordance with their agreement until August 19th, 1926, when Harry Marcotte, A. L. Peck, and defendant made a further agreement which recited the making of the lease to Evans, the assignment and assumption of the lease and other obligations by Marcotte, the making of the bond by Peck and Dolson to secure the payment of the note, and the desire of the parties to reduce the rent due under the lease for the remainder of its terms. Defendant therein agreed to accept $450 per month instead of $600 for the remainder of the term, to waive further interest on the note, and in place of the bond as aforesaid, to accept a mortgage in the sum of $10,000 upon certain property owned by Peck and his wife, which mortgage was afterwards duly and properly executed by the Pecks.

The Marcottes continued in the possession and operation of the hotel under this last agreement until March 1st, 1928, when they voluntarily vacated the premises and have never since occupied them or paid any rent. Defendant declined to accept the surrender of possession, insisting that the Marcottes were bound by the lease, and notified them that in order to lessen their liability he would re-rent the premises, which he did in such a manner that no damages accrued to him from the loss of the rental reserved in the lease. During all this time payments had been made upon the note for $24,000 until it was at the time of the bringing of this action reduced to $8,500.

Under these circumstances the Marcottes and the Pecks brought this action against defendant under

the Declaratory Judgment Act (Rev. Code 1928, § 4385 et seq.), contending that the lease was void *ab initio,* that the sole consideration for the note and mortgage was the void lease, and that the note, mortgage and lease were so interwoven and inseparable that they were all void. They based their claim of the invalidity of the lease upon the admitted fact that at the time in 1919 when it was executed by defendant and Evans, and at all times thereafter up to the bringing of this action, defendant Leeker was a married man; that the real estate and premises in question was at all times the community property of the defendant and his wife, and that she had never executed, acknowledged, or given her consent in any manner to any of the instruments above referred to. The invalidity of the lease on the facts last stated was at the trial of this action admitted by all parties, and it was upon that admission and the other facts herein set forth that the trial court rendered its declaratory judgment that the instruments in question were all void *ab initio.*

It is agreed by all of the parties that the principal question of law is whether or not upon this state of facts the note of Evans is so inseparably interwoven with and a part of the lease that the admitted invalidity of the lease also makes the note void. The general principles governing a question of this nature are well set forth in 6 R. C. L., pages 858 to 860, as follows:

"It is not always an easy matter to determine just what contracts are severable and what are not. The authorities agree that in determining whether a contract shall be treated as severable or as an entirety *the intention of the parties will control, and this intention must be determined by a fair construction of the terms and provisions of the contract itself.* In order to arrive at a correct construction, due regard must be had to the intention of the contracting par-

ties as revealed by the language which they have employed, and the subject-matter to which it has reference. Some courts, it may be pointed out, appear to be inclined to treat contracts as severable. Whether a contract is entire or divisible cannot, under this view, be determined by a single term, phrase or sentence, though it is broad enough to include such meaning, unless throughout the whole agreement and from the surrounding circumstances it definitely appears that it was the intention of the parties that the contract should be entire and indivisible. But although it has been declared that a contract to do several things, at several times, is divisible in its nature, it may be said that the entirety of a contract depends upon *the intention of the parties, and not on the divisibility of the subject.* The severable nature of the latter may often assist in determining the intention, but will not overcome the intent to make an entire contract, when that is shown.'' (Italics ours.)

As a means of determining the intention of the parties on this point, when it is not expressly and explicitly stated in the contract, various tests have been adopted, there being two principal ones found in the decisions. The first is: Was the consideration for the two or more promises, part of which was and part was not valid, entire or is it divisible and separable so as to be capable of apportionment among the several promises without doing violence to the terms of the contract, or without making a new contract for the parties? The second is: Were the two or more promises so interdependent that the parties would not have entered into the one without the others? Many cases are found which are determined upon the one test, and perhaps an equally large number are decided upon the other; but it must always be remembered that these tests are merely means of arriving at the true intention of the parties, and when that is determined the ultimate question is settled.

Counsel have devoted a considerable portion of their briefs to discussing whether or not the oral testimony found in the record as to the various negotiations, discussions, promises, and acts of the respective parties leading up to the execution of the instruments in question are admissible under the parol evidence rule. We think, however, that it is unnecessary for us to determine this question, for in our opinion the result reached would be the same whether the parol evidence may be considered as illustrating and explaining the written instruments or whether it may not. Briefly summed up, we are of the opinion that the only conclusions of ultimate fact which the trial court could possibly have reached from the evidence are that Evans desired a new lease for a larger portion of the building and that Leeker should advance the money necessary to improve it according to Evans' plans. On these conditions he was willing not only to pay the rent, but repay the money so advanced. Leeker was perfectly satisfied to give the new lease and advance the money for the improvements, on condition that he should be assured both of a reliable tenant for a long time and the repayment of the money which he had advanced. We think that no sane man would believe for one minute that Evans would have agreed to borrow from Leeker $24,000, use it in improving Leeker's real estate, and then to repay the $24,000 loaned, unless he received from Leeker a long-time lease on the building on conditions satisfactory to him. On the other hand, it is inconceivable that Leeker under the circumstances would have at that time spent $24,000 in remodeling the building as a hotel if he had not believed and intended that he was to get the money for his improvements back and a satisfactory rental for the premises over a long period.

We think the situation existing in the case at bar was well described in the language of the Supreme

Court of the state of Washington in the case of *Godefroy* v. *Hupp et al.*, 93 Wash. 371, 160 Pac. 1056, Ann. Cas. 1918E 494, as follows:

"If the several stipulations of a single contract are so interdependent that the parties cannot reasonably be considered to have contracted *but with a view to the performance of the contract as a whole,* and any part of the contract is subject to the ban of the statute of frauds, then no recovery can be had upon any part of it." (Italics ours.) *Eriksen et ux,* v. *Manufacturers' Dist. Co.*, 103 Wash. 159, 173 Pac. 1095.

The Supreme Court of Nevada, in *Linebarger* v. *Devine et al.*, 47 Nev. 67, 214 Pac. 532, 217 Pac. 1101, says:

"Whether a contract is entire, or separable into distinct and independent contracts, is a question of the intention of the parties, to be ascertained from the language employed and the subject-matter of the contract. *Hutchens* v. *Sutherland,* 22 Nev. 363, 40 Pac. 409; *State* v. *Jones,* 21 Nev. 510, 34 Pac. 450. Whether, then, a contract is divisible, is a question of law, dependent upon the terms of the contract; but what are the terms thereof is a question of fact. If the several stipulations in the transaction are so interdependent that the parties cannot reasonably be considered to have contracted but with a view to the performance of the whole, or that a distinct engagement as to any one stipulation cannot be fairly and reasonably extracted from the transaction, no recovery can be had upon it, however clear of the statute of frauds it may be, or whatever be the form of action employed. The engagement in such case is said to be entire and indivisible."

The rule is also laid down in *Wooten* v. *Walters,* 110 N. C. 251, 14 S. E. 734, in the following language:

" . . . A contract is entire, and not severable, when, by its terms, nature, and purpose, it contemplates and intends that each and all of its parts,

material provisions, and the consideration are common each to the other, and interdependent. . . . On the other hand, a severable contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be. . . . This rule makes the interpretation of the contract depend on the intention of the parties as manifested by their acts and the circumstances of each particular case. *Brewer* v. *Tysor,* 3 Jones (48 N. C.) 180; *Niblett* v. *Herring,* 4 Jones (49 N. C.) 262; *Brewer* v. *Tysor,* 5 Jones (50 N. C.) 173; *Dula* v. *Cowles,* 7 Jones (52 N. C.) 290 [75 Am. Dec. 463]; *Jarrett* v. *Self,* 90 N. C. 478; *Chamblee* v. *Baker,* 95 N. C. 98; *Lawing* v. *Rintles,* 97 N. C. 350, 2 S. E. Rep. 252; *Pioneer Manuf'g. Co.* v. *Phoenix Assur. Co.* [110 N. C. 176], 14 S. E. Rep. 731 [28 Am. St. Rep. 673] (decided at the present term); Story, Cont. (5th Ed.) §§ 21–25; 3 Pars. Cont. 187; Whart. Cont. §§ 338, 511, 748.''

See, also, *Stanley* v. *Sumrell,* (Tex. Civ. App.) 163 S. W. 697.

Of all the cases cited by both plaintiffs and defendant, the facts in *McMullen* v. *Riley,* 6 Gray (Mass.) 500, are nearest like those of the case at bar. The opinion of the court is brief, and we quote it in full as follows:

''The oral contract of the parties was, in substance and effect, that the plaintiff was to let his store to the defendant for one year, and put in certain fixtures for its more convenient use. The defendant was to pay a rent of one hundred and twenty five dollars and the expense of the fixtures.

''The defendant did not occupy the store, though no obstacle seems to have been interposed by the plaintiff. The action is brought to recover the amount expended for the fixtures.

''The agreement for the lease is clearly within the statute of frauds. The question is, whether the contract can be severed, and enforced for that which is

good; or whether it is in its nature entire, and its parts dependent. We think the agreement as to the fixtures was dependent wholly upon that for the lease. The parties made no agreement for a lease without the fixtures, or for the fixtures except with a view to the lease. When the contract for the lease falls, the dependent stipulation as to the fixtures falls with it. *Irvine* v. *Stone*, 6 Cush. 508. *Vaughan* v. *Hancock*, 3 C. B. 766.''

Counsel for defendant has cited to us as bearing upon the question the following cases: *Pacific Wharf & Storage Co.* v. *Standard American Dredging Co. et al.*, 184 Cal. 21, 192 Pac. 847; *Kansas City H. P. Brick Co.* v. *National Surety Co.*, (C. C. A.) 167 Fed. 496; *Lincoln Sav. Bank & Safe Deposit Co.* v. *Allen et al.*, (C. C. A.) 82 Fed. 148; *Walters* v. *United States Fidelity & Guaranty Co.*, 35 N. M. 4, 288 Pac. 1044; *Piper* v. *Boston & M. R. R.*, 75 N. H. 435, 75 Atl. 1041; *Bridges* v. *Lahman*, 124 Okl. 220, 255 Pac. 693; *Mattison* v. *Connerly*, 46 Mont. 103, 126 Pac. 851; *T. M. Gilmore & Co.* v. *W. B. Samuels & Co.*, 135 Ky. 706, 123 S. W. 271, 21 Ann. Cas. 611; *Higham* v. *Harris*, 108 Ind. 246, 8 N. E. 255; *McGrath* v. *Cannon et al.*, 55 Minn. 457, 57 N. W. 150; *Bradford & Carson* v. *Montgomery Furniture Co.*, 115 Tenn. 610, 92 S. W. 1104, 9 L. R. A. (N. S.) 979.

We have examined each and all of these cases with care and analyzed the facts therein and find no quarrel with the judgment reached on the particular state of facts involved. Most of them apparently are based upon the fact that in the particular case the consideration was severable, and that therefore the enforcement of the legal part of the contract in return for the particular consideration belonging to it could be had so that both parties would obtain justice, the illegal part with its particular consideration falling.

None of these cases, however, have facts at all similar to the present one, and in none of them does it appear that serious injury or an injustice would be done to either party by holding the contract to be severable. Most of them involve the sale of separate articles for separate prices. In such a case it is obvious that since the parties have fixed a separate price for each article the presumption is that no harm will be done by enforcing payment for the legal sale, while excluding the illegal one. In the case at bar, however, it appears that the only benefit which Evans could possibly have gained in return for the payment of the $24,000 represented by the note was a valid lease for the premises. Unless he got this he got nothing. Defendant, on the other hand, improved his premises to the extent of $24,000 at the expense of Evans, with no benefit to the latter if the lease were void. To suppose that Evans would knowingly and intentionally have entered into any agreement where such a thing were possible is the height of absurdity. We are of the opinion that the trial court therefore properly held that the lease and the note were so interdependent, and that the intention of the parties was to make them so interdependent that the contract is indivisible, and, as the universal rule holds in such a case, since part of the contract is void, it must fall as a whole. If, therefore, Evans were the plaintiff in this suit, we think there is no question that he would be entitled to a declaratory judgment that since the lease was void the note was void also.

But, it is urged by defendant, even admitting that no recovery could be had against Evans on the lease or note for the reasons given above, the Marcottes cannot assert the invalidity of the lease in order to be relieved of the obligations assumed in the instrument assigning it to them. His position on this point is that the agreement between the Marcottes,

Evans and defendant, which contains the assignment of the lease, contained no covenant on the part of Evans warranting that the lease was valid, but merely an assignment of whatever interest he might have therein, and that such assignment is a good consideration for the agreement made by the Marcottes to pay the amount of the note.

It is the contention of plaintiffs, on the other hand, that the assignee of a lease merely steps into the shoes of his assignor, subject to the same liability, and with a right to the same defenses which the assignor had to the lease. This general principle is not disputed by defendant. He admits that the ordinary effect of a simple assignment of a lease is to substitute the assignee for the assignor, with all the rights and duties of the latter to the lessor so far as the covenants running with the land are concerned, although personal and independent covenants contained in the lease do not by mere assignment of the instrument bind the assignee. *Bonetti* v. *Treat,* 91 Cal. 223, 27 Pac. 612, 14 L. R. A. 151; *Lutton* v. *Rau,* 37 Cal. App. 429, 173 Pac. 1111; *Kribbs* v. *Alford,* 120 N. Y. 519, 24 N. E. 811.

But, says defendant, the instrument containing the assignment in question is far more than an ordinary assignment. It is an independent tripartite agreement between the Marcottes, as assignees, Evans, as assignor, and himself as lessor, containing not only an assignment of the lease, but many additional obligations upon all of the parties, and such an instrument is not to be measured by the rule applying to ordinary simple assignments, but is to be construed as an independent and separate contract. We are of the opinion, upon examining the terms of the instrument referred to, that it is far from being an ordinary and simple assignment, but that as contended by defendant it is a complete contract in itself, and is to be construed by the general rules

applying to contracts and not by the ordinary rule applying to assignments.

A very similar legal issue to that now under consideration by us arose in the case of *Norton* v. *Stroud State Bank,* 17 Okl. 295, 87 Pac. 848. In that case one Lynch was the lessee in a lease for certain real estate. He assigned it to the Nortons, and they in consideration of the assignment executed a note in favor of Lynch, which was by the latter assigned for collateral security to the Stroud State Bank. The Nortons went into possession of the premises and used them for some time. In an action on the note the defense was made that the lease was invalid, and the invalidity urged was the same in law as the one in the present case, to wit, that the party executing the lease had no authority to make it. The court stated as follows: "So far as the record in this case shows, the Indian boy and his guardian still approve the lease, and consent to the lessees' enjoyment of its benefits. The case at bar is not an instance of a party seeking to disaffirm or avoid a contract by the party having such right, but is an attempt by the assignees to set up the defect or invalidity in the contract to avoid paying a note given for the assignment of the lease which they purchased with knowledge of what they were getting, and after they had enjoyed all the benefits of their bargain. Not only is the record silent as to any objection on the part of the guardian or his ward, but by the express stipulation of the parties it is agreed that the lease to Lynch was a valid lease, that he made a legal assignment of it to plaintiffs in error, that he put the plaintiffs in error in possession, that they cultivated and used the premises, and are still in possession of them. Now, under this state of facts, we think it would be a gross inequity and injustice to allow the plaintiffs in error to take the benefits of the lease, and then avoid the payment of the note given in consid-

eration for the same," and gave judgment on the note. It will be seen that in all essential particulars the facts which were necessary to raise the legal issue under discussion in the case cited are similar to those of the case at bar, with the exception that in the Norton case the makers of the note remained in possession of the premises up to and including the time of trial, while in this case the Marcottes only remained in possession for six years and then surrendered such possession against the protests of the maker of the lease. In neither case did the parties whose consent was necessary to a valid lease make any objection thereto or attempt to dispossess the assignees of the lease.

In the later case of *Jones* v. *Byington,* 56 Okl. 284, 155 Pac. 1118, the lease actually failed through the action of the lessor, but the court held that notwithstanding this fact the assignee took the assignment with notice and without any warranty on the part of the lessee, so that he could not complain of the loss of his money by the failure of the lease, and the case of *Norton* v. *Stroud State Bank, supra,* was given as authority for the rule.

A similar situation arose in the case of *Sanborn* v. *Cree,* 3 Colo. 149. Sanborn was on the note and alleged that it was given in consideration of the assignment of a lease to him, which lease at the time of the assignment was void. The court held that an assignment of a lease without warranty, even though the lease failed, was sufficient consideration for a promissory note, in the absence of an allegation or proof of fraud against the assignee.

Plaintiffs urge that the case of *Norton* v. *Stroud State Bank, supra,* has been overruled in the case of *King* v. *Coombs,* 36 Okl. 396, 122 Pac. 181. The facts in the last-cited case were very different from those in the Norton case, and the court expressly distinguished the two cases.

We hold, therefore, following the rule laid down in *Norton* v. *Stroud State Bank, supra,* that when an assignee of a lease enters into possession of the premises and only leaves them before the expiration of the term mentioned in the lease voluntarily, and not because of his eviction by some person claiming or holding a superior title, he may not set up in defense against an action to enforce a note assumed by him in consideration of the assignment, that the lease was void as a matter of law. Such being the case, the trial court erred in rendering judgment that the instruments whereby the Marcottes agreed to pay the balance due on the note in question were void and of no effect, and if they were good as to the Marcottes, the mortgage given by their coplaintiffs, the Pecks, was also good.

The judgment of the superior court of Santa Cruz county is reversed and the case remanded, with instructions to render judgment in favor of defendant in consonance with the principles stated in this opinion.

McALISTER, C. J., and ROSS, J., concur.